***********
The Full Commission reviewed the prior Opinion and Award, based upon the record of the proceedings before the Deputy Commissioner and the briefs and argument before the Full Commission. The appealing party has not shown good grounds to reconsider the evidence; receive further evidence or rehear the parties or their representatives; or amend the Opinion and Award. Accordingly, the Full Commission affirms, with modifications, the Opinion and Award of the Deputy Commissioner.
 ***********
The Full Commission finds as fact and concludes as matters of law the following, which were entered into by the parties in a Pre-Trial Agreement and at the hearing before the Deputy Commissioner as:
 STIPULATIONS
1. All parties are properly before the Industrial Commission, and the Commission has jurisdiction over the parties and the subject matter of this case.
2. An employer-employee relationship existed between the defendant-employer and plaintiff at all relevant times in this claim.
3. Defendant-employer was insured by Cincinnati Insurance Company on the date of the alleged injury.
4. The parties have stipulated to an average weekly wage of $460.80.
5. In addition to the pre-hearing depositions that were taken, the parties stipulated the following exhibits into evidence:
 A. Pre-Trial Agreement;
 B. Industrial Commission forms;
 C. Stipulated Packet of Medical Records;
 D. Plaintiff's Recorded Statement;
 E. Cape Fear Cardiology Job Description;
 F. Stipulation of Testimony of Carol Ann Plant; and
 G. Correspondence from Peggy Brock.
 ***********
Based upon all the competent evidence of record, the Full Commission makes the following:
 FINDINGS OF FACT
1. At the time of hearing before the Deputy Commissioner, plaintiff was 38 years old. She had completed the 11th grade and later obtained a high school equivalency certificate by passing the General Educational Development Test ("GED") in 1984 through Fayetteville Technical College. Plaintiff furthered her education by attending some medical assistant courses at Rutledge College but did not obtain any certifications. Plaintiff completed a home correspondence course in medical transcription. Plaintiff is right hand dominant.
2. Prior to her employment with defendant-employer, plaintiff had been employed as a waitress, cook, general construction laborer and secretary. Plaintiff has been employed with various medical facilities as a medical transcriptionist for approximately seven years prior to becoming employed with defendant-employer.
3. On June 10, 1999, plaintiff presented to Baldwin Chiropractic Center with complaints of pain, numbness and tenderness between her shoulders, and in her elbow and hands. Plaintiff testified that she had experienced these symptoms off and on for approximately one year, with the condition worsening over the prior two months. Plaintiff described the activities of sitting and standing up straight and typing as provoking the pain between her shoulders and typing and writing provoking the pain in her hands. She described the sensation between her shoulders as a burning tenderness and a dull ache at her elbows as well as a dull ache with swelling in the hands. Plaintiff treated with Baldwin Chiropractic Center from June 10, 1999, through November 9, 1999. At the time plaintiff was seen at Baldwin Chiropractic Center, she was employed with Lafayette Clinic as a medical transcriptionist.
4. On July 11, 2000, defendant-employer hired plaintiff as a transcriptionist. Her work hours were from 8:00 a.m. to 5:00 p.m. with a break for lunch from 12:00 to 1:00 p.m. Plaintiff worked Monday through Friday.
5. Plaintiff's job station was a cubicle with a computer and keyboard. The keyboard was positioned on a pull out drawer attached to her desk where plaintiff could raise or lower her chair and adjust her keyboard so that it would tilt.
6. At the time plaintiff began working for defendant-employer, defendant-employer was staffed with five cardiologists and two additional transcriptionists. Each cardiologist would see, on an average, 12 to 25 patients per day. On an average workday, plaintiff completed 30 charts. Plaintiff testified that she typed 120 words per minute for six to seven hours per workday.
7. Approximately three months after plaintiff began work, defendant-employer added a sixth cardiologist to its staff as well as a nuclear clear stress test which increased plaintiff's work load. Plaintiff typed approximately 60 to 100 pages per day from doctors' dictation.
8. Plaintiff had several other job duties in addition to typing. Plaintiff's job duties also included filing charts, carrying charts downstairs in milk crates, and logging entries. The boxes of charts weighed approximately ten pounds.
9. Between February 23, 2001, and October 22, 2001, and February 18, 2002, through May 16, 2002, plaintiff sought follow-up care at Baldwin Chiropractic for complaints involving her wrist, elbows and shoulders.
10. In August 2002, plaintiff began to experience increased pain between her shoulder blades and up her arms with pain radiating through her elbows to her wrist.
11. On August 28, 2002, plaintiff was seen at Hoke Family Medical Center in Raeford, North Carolina. Plaintiff complained of tightness in the muscles in her back, neck, shoulders and arms. Plaintiff provided a history of onset after an increase in her workload at her job. Plaintiff underwent a thyroid function test, rheumatoid arthritis test, sedimentation rate test and an antinuclear antibody test, all of which were normal.
12. The Hoke Family Medical Center provided plaintiff a work note advising her to remain out of work from August 28, 2002, through September 3, 2002. Plaintiff was also referred for an orthopaedic evaluation.
13. On September 13, 2002, plaintiff was seen by Dr. Douglas McFarlane of the Cape Fear Orthopaedic Clinic. Plaintiff complained of a dull aching with occasional stabbing and tingling with weakness in her right upper extremity and right elbow. Dr. McFarlane opined that plaintiff suffered from right shoulder pain as well as medial and lateral epicondylitis of the right elbow. Plaintiff was advised to remain out of work for two weeks and then return to work with no lifting, repetitive pushing, pulling movements or overhead lifting of the right upper extremity.
14. On October 3, 2002, plaintiff again presented to Dr. McFarlane, with complaints of increasing pain that she described as a burning, aching type of pain in the interscapular area across both shoulders. Plaintiff further described a burning sensation going down the upper arms and at times down to the wrist with the right side being more affected than the left.
15. Dr. McFarlane diagnosed plaintiff with epicondylitis with possible fibromyalgia, miofascial syndrome most likely caused or aggravated by the duties of her employment. Plaintiff was advised not to do any repetitive or strenuous activities using her upper limbs.
16. Defendants referred plaintiff's records for review by Dr. Edwards of Raleigh Hand Center, an expert in hand and upper extremity orthopedics. Dr. Edwards opined plaintiff's epicondylitis and fibromyalgia were not related to her job duties with Cape Fear Cardiology.
17. At the hearing before the Deputy Commissioner, plaintiff testified that defendant-employer gave her a letter dated October 6, 2002, which stated that she had exhausted her paid personal leave and that her job as a transcriptionist would be held open only until November 3, 2002. Plaintiff did not return to work on November 3, 2002, or anytime thereafter.
18. Plaintiff testified that she was unable to work as a transcriptionist, and applied for unemployment benefits, but was denied. Plaintiff further testified that she worked at Tobacco Road Outlet for approximately three weeks as a store clerk during the summer of 2003, but could not continue because of pain.
19. Plaintiff was referred to Dr. Brenner, another upper extremity orthopedic expert, for an independent medical examination in January 2003. Dr. Brenner concurred that plaintiff's conditions were not causally related to or aggravated by her employment with Cape Fear Cardiology.
20. On July 18, 2003, plaintiff was seen by Dr. Muhammad Khasru of the Cape Fear Neurology Associates. Dr. Khasru opined that plaintiff suffered from miofascial pain syndrome versus fibromyalgia, right C6 radiculopathy and right shoulder and wrist arthropy. Plaintiff was referred for an MRI of the right shoulder and right wrist as well as nerve conduction studies and an EMG of the upper extremities.
21. On July 18, 2003, plaintiff underwent an MRI of the cervical spine that revealed mild cervical muscle spasm with no other abnormality identified.
22. On August 2, 2003, plaintiff underwent an MRI of the right shoulder that revealed findings consistent with supraspinatus tendonopathy with a possible tear.
23. On August 8, 2003, plaintiff underwent an MRI of the right wrist, which revealed abnormal increased signal intensity along the nerve of inversion recovery sequences.
24. On August 20, 2003, plaintiff underwent EMG nerve conduction studies that were interpreted as showing a mild conduction block on the right ulnar nerve of the elbow and mild ulnar sensory motor neuropathy and sensory motor neuropathy bilaterally.
25. On September 3, 2003, plaintiff again presented to Dr. Khasru, who diagnosed plaintiff with probable myofascial pain syndrome as well as right cubital tunnel syndrome and was referred her to Dr. Barnes of the Fayetteville Orthopaedic Clinic.
26. On September 29, 2003, plaintiff presented to Dr. Christopher Barnes, who opined that plaintiff suffered from impingement tendinitis with a possible small rotator cuff tear. Dr. Barnes restricted plaintiff to no overhead extremity use and no heavy lifting. Dr. Barnes initially focused his attention on plaintiff's right shoulder and ultimately performed a subacromial decompression with distal clavicle co-planning on October 23, 2003.
27. Dr. Barnes further opined that plaintiff reached maximum medical improvement with regard to her shoulder on approximately January 19, 2004, and that he would have released plaintiff to full duty at that time. Dr. Barnes would have assigned a 10% permanent partial impairment to the shoulder as a result of the surgery.
28. On June 24, 2004, Dr. Barnes performed a debridement of plaintiff's left elbow and removed her from work until July 9, 2004. Dr. Barnes opined that plaintiff reached maximum medical improvement on September 13, 2004, and would have retained some degree of permanent partial impairment although Dr. Barnes had not rated plaintiff for her elbow.
29. On October 12, 2004, Dr. Barnes performed a debridement of plaintiff's right elbow. Dr. Barnes opined that plaintiff reached maximum medical improvement with regard to her right elbow on January 1, 2005, and again would have retained some degree of permanent partial impairment although Dr. Barnes had not rated plaintiff at that time.
30. While being treated by Dr. Barnes for her right shoulder impingement tendinitis and bilateral epicondylitis, plaintiff presented to Dr. René Kotsen of the Carolina Neurosurgical Services. On December 10, 2003, Dr. Kotsen diagnosed plaintiff with right ulnar anticubidal fossil syndrome and left-sided and mild anticubidal fossil syndrome.
31. On March 9, 2004, Dr. Kotsen performed an ulnar nerve decompression of plaintiff's left carpal tunnel and on March 24, 2005, Dr. Kotsen performed an ulnar decompression of plaintiff's right carpal tunnel.
32. Defendants referred plaintiff's new medical records from her shoulder and elbow treatment to Dr. Edwards for re-evaluation of her current condition. In a June 2004 report, Dr. Edwards reiterated his previous opinions that none of plaintiff's conditions were related to her employment with defendant-employer.
33. Although plaintiff testified that she has applied to numerous businesses for employment since her termination from defendant-employer on November 3, 2002, she testified that she had been unsuccessful.
34. Plaintiff also testified that she performs some gardening activities at home. These activities are reflected in the records from plaintiff's April 26, 2004, visit with Dr. Kotzen in which she reported that these activities significantly aggravated her symptoms.
35. Gwen Snipes, a transcriptionist for defendant-employer, testified on behalf of defendants at the hearing before the Deputy Commissioner. Ms. Snipes stated that in August 2002, she was employed as a transcriptionist for Cape Fear Cardiology and that the workload did not increase significantly during the period of plaintiff's employment. Ms. Snipes testified that just before plaintiff left work in August 2002, she complained for several consecutive days that she was experiencing increased pain due to painting and remodeling her trailer in preparation for her upcoming marriage.
36. Ms. Snipes further testified that plaintiff told her she was tired of her job and was going to ask her doctor to take her out of work. Ms. Snipes stated that plaintiff said she would return to her treating physician and complain of ongoing symptoms and he would take her out of work. According to Ms. Snipes, the following day plaintiff left work early to see her family physician. This was the last date plaintiff worked for Cape Fear Cardiology.
37. Peggy Brock, an administrator at Cape Fear Cardiology, also testified on behalf of defendants at the hearing before the Deputy Commissioner. Ms. Brock testified that plaintiff was hired in anticipation of Cape Fear Cardiology bringing on a sixth doctor in 2000. Ms. Brock indicated that while plaintiff was employed with Cape Fear Cardiology, there was never a backlog of medical records and, in fact, the transcriptionists had ample time to perform other non-typing activities such as daily logging, copying notes, filing charts, and mailing final distributions.
38. The parties entered into a stipulation concerning the testimony of Carol Ann Plant, another Cape Fear Cardiology employee. Pursuant to the stipulation, the parties agreed that Carol Ann Plant was employed as the lead transcriptionist at Cape Fear Cardiology Associates in August 2002, and that if she appeared at the hearing before the Deputy Commissioner, she would have corroborated the testimony of Gwen Snipes. Ms. Plant would have testified that she also overheard plaintiff complain on numerous occasions that her pain and symptoms had increased as a result of painting and remodeling her trailer. Ms. Plant's testimony would have corroborated Ms. Snipes' testimony that just before the end of plaintiff's employment, plaintiff stated "all she had to do was complain one more time and her treating physician would take her out of work."
39. Dr. Edwards, an expert in orthopedic hand surgery reviewed plaintiff's detailed job description, her recorded statement, and medical records. He testified that epicondylitis is tendonitis in the elbow where the extensor tendon on the lateral side becomes inflamed from repetitive movement. This repetitive movement generally involves movement of the hand/arm from the palm up to palm down position. Dr. Edwards testified that overuse or repetitive motion can cause epicondylitis but requires activities where the elbow is strained due to the aforementioned motion but that there was no indication that plaintiff's job duties involved the sort of repetitive motion necessary to cause epicondylitis.
40. Dr. Edwards further testified that he did not consider epicondylitis to be peculiar to the job of transcriptionist as it is rarely seen in keyboard work. Dr. Edwards opined that plaintiff was not subjected to an increased risk of developing epicondylitis as a result of her job duties as a transcriptionist.
41. Dr. Edwards opined that plaintiff had pre-existing epicondylitis prior to the date of onset she reported to the Industrial Commission and that her job duties would not significantly contribute to her development of epicondylitis or materially aggravate her pre-existing condition. He further opined that based on plaintiff's job description, she should be able to return to full duty work.
42. Dr. Edwards testified that fibromyalgia was a chronic pain condition of unknown etiology, usually affecting women over the age of 30, involving pain in the neck, back, and elbows and can cause tendonitis. Dr. Edwards opined that there was no evidence that plaintiff's fibromyalgia could be caused or aggravated by her employment.
43. At plaintiff's request, Dr. Brenner, an orthopedic surgeon, reviewed a complete set of plaintiff's medical records and performed an independent medical examination. Dr. Brenner described epicondylitis as inflammation of the extensor tendon at the elbow, which is often caused by repetitive movement of the arm from the palm down to the palm up position. Dr. Brenner testified that overuse/repetitive motion can cause epicondylitis, but opined that the type of repetitive motion required to cause epicondylitis was not present in this case.
44. Dr. Brenner testified that plaintiff's job duties would not materially aggravate her pre-existing epicondylitis. He also opined that epicondylitis would not be peculiar to the position of transcriptionist, and that plaintiff was not subjected to increased risk of developing epicondylitis as a result of her job duties with defendant-employer. Dr. Brenner opined that plaintiff's restrictions were unrelated to her employment and that plaintiff could return to full-duty work in her position with defendant-employer.
45. Dr. Douglas McFarlane, an orthopedist, diagnosed plaintiff with fibromyalgia and superimposed epicondylitis. Dr. McFarlane opined to a reasonable degree of medical certainty that plaintiff's job duties as a transcriptionist placed her at an increased risk of developing bilateral epicondylitis and that her job duties were a significant causal factor in the development of her epicondylitis but that her fibromyalgia was not the result of or aggravated by her employment. Dr. McFarlane testified that symptoms of epicondylitis generally improve once the patient stops performing the activities that are causing or aggravating the condition. He noted that it was unusual plaintiff's epicondylitis did not improve with rest when she was taken out of work.
46. Dr. McFarlane denied that epicondylitis caused by repetitive motion generally required activities where the arm moves from the palm down to the palm up position. He acknowledged that ergonomics of the workstation are significant in determining a possible causal relationship between job duties and epicondylitis but was unaware that defendant-employer had provided an ergonomic keyboard and workstation throughout her employment. The Full Commission gives less weight to Dr. McFarlane's testimony than that of Dr. Edwards or Dr. Brenner as he does not hold the specialization in upper extremity and hand surgery held by Dr. Edwards, nor does he work as frequently with upper extremity cases as Dr. Brenner.
47. On July 7, 2005, the parties re-deposed Dr. Edwards, who reiterated his opinions that plaintiff's epicondylitis and fibromyalgia were not caused, or aggravated by plaintiff's employment, nor was she placed at an increased risk of developing these conditions as a result of her employment. Dr. Edwards testified that he reviewed the additional medical records related to plaintiff's shoulder and elbow treatment and opined that plaintiff's surgical intervention to address her epicondylitis was not related to, or necessitated by, her employment as a transcriptionist with defendant-employer.
48. Dr. Edwards further testified that cubital tunnel syndrome is essentially a pinched nerve that runs through the cubital tunnel in the elbow. In reviewing plaintiff's job duties, Dr. Edwards testified that he did not see any evidence that plaintiff's cubital tunnel syndrome was caused, or aggravated by, her employment as a transcriptionist. Further, he testified that plaintiff's surgical decompression of the ulnar nerve to address her cubital syndrome was not causally related to her employment and that plaintiff's employment did not subject her to an increased risk of developing cubital tunnel syndrome.
49. Regarding plaintiff's diagnosis of impingement tendonitis and possible right rotator cuff tear, Dr. Edwards opined that plaintiff's right shoulder impingement tendonitis was not caused, or aggravated by her employment with defendant-employer; that plaintiff's job duties did not subject her to an increased risk of developing these conditions; and that her shoulder surgery was not related to her employment. He testified that impingement tendonitis is generally caused by a traumatic injury or repetitive use of the arm overhead and that there was no evidence that plaintiff performed repetitive overhead activities.
50. Dr. Edwards testified that the gardening activities plaintiff reported could cause or aggravate her pre-existing conditions as well as the remodeling and painting of her trailer. Dr. Edwards testified that based upon his review of plaintiff's job description, she could return to full duty work without restrictions as a transcriptionist.
51. Dr. Barnes, a board certified orthopedic surgeon testified that plaintiff was not placed at an increased risk of developing right shoulder impingement tendonitis. Dr. Barnes also testified that plaintiff's job duties were not a significant causal factor in the development of her shoulder condition. Dr. Barnes opined that there was a correlation between plaintiff's work as a transcriptionist and her epicondylitis; however, Dr. Barnes was unable to testify that plaintiff's job duties were a significant causal factor in the development of plaintiff's epicondylitis. Dr. Barnes acknowledged that he was not aware of plaintiff's specific job duties as transcriptionist, nor did plaintiff ever report what her job duties entailed upon presenting for treatment. Dr. Barnes also testified that he was not provided any previous medical records.
52. Dr. Barnes opined that plaintiff's elbow condition continued to worsen while treating with him, despite the fact that she was out of work. Dr. Barnes testified that plaintiff's increased symptoms during the time that she was not performing her job duties would suggest that her employment was less likely a causal factor in the development of her condition. Dr. Barnes acknowledged that plaintiff's gardening activities, and home renovation/home painting could likely cause or aggravate her shoulder and elbow conditions.
53. Based on the competent evidence of record, the Full Commission finds that plaintiff has failed to establish that her employment with defendant-employer placed her at an increased risk of contracting epicondylitis or any other occupational disease, or that said employment was a significant causal or aggravating factor in plaintiff's epicondylitis or other occupational disease.
 ***********
Based upon the foregoing stipulations and findings of fact, the Full Commission makes the following:
 CONCLUSIONS OF LAW
1. An occupational disease is defined as any disease "which is proven to be due to causes and conditions which are characteristic of and peculiar to a particular trade, occupation or employment, but excluding all ordinary diseases of life to which the general public is equally exposed outside of employment." N.C. Gen. Stat. § 97-53(13).
2. Three elements are necessary to show the existence of a compensable occupational disease: "(1) the disease must be characteristic of persons engaged in a particular trade or occupation in which the plaintiff is engaged; (2) the disease must not be an ordinary disease of life to which the public is equally exposed; and (3) there must be a causal connection between the disease and the plaintiff's employment."Jarvis v. Food Lion, 134 N.C. App. 363, 367, 517 S.E.2d 388, 391 (1999), citing Hansel v. Sherman Textiles, 304 N.C. 44, 283 S.E.2d 101 (1981).
3. The greater weight of the expert testimony was insufficient to establish that plaintiff's employment with defendant-employer placed her at an increased risk of contracting epicondylitis or any other occupational disease, or that said employment was a significant causal or aggravating factor in plaintiff's epicondylitis or other occupational disease. Accordingly, plaintiff has failed to meet the required burden of proof to establish a claim for occupational disease under the North Carolina Workers' Compensation Act. N.C. Gen. Stat. § 97-53(13).
 ***********
Based upon the foregoing stipulations, findings of fact and conclusions of law, the Full Commission enters the following:
 AWARD
1. Under the law, plaintiff's claim for workers compensation benefits must be, and is, hereby DENIED.
2. Defendants shall bear the costs.
 S/ _______________________ PAMELA T. YOUNG COMMISSIONER
CONCURRING:
 S/_______________________ THOMAS J. BOLCH COMMISSIONER
 S/_______________________ BUCK LATTIMORE CHAIRMAN